Company, Appellate. Mr. Phillips for the Appellate, Ms. Warner for the Appellees. Good morning, Your Honors, and may it please the Court. The fundamental flaw in the proceedings below is that this case was permitted to go beyond summary judgment and ultimately to a jury on the issue of lost profits. And the reason why that shouldn't have happened is that, first of all, the contract, most naturally read, frankly, precludes lost profits and lost revenues as an allowable source of recovery for the plaintiff in this case. And then second, assuming we got past that, once we got to the trial, the plaintiff never put on the kind of fundamental evidence that the plaintiff needs to put on in order to demonstrate lost profits when you're talking about a brand new business enterprise where you have nothing but sort of hopes and prayers as to exactly how it will play out. At the end of the day, failing to put on an expert, failing to put on any of the kind of financial projections in a real world, not just projections in a speculative world, not putting on any other comparators, none of the kind of evidence that you traditionally see in a lost profits case. All that the plaintiffs did was say there was a breach, the contract didn't turn out the way we wanted it to, and at the end of the day, therefore, we should just send it to the jury and let the jury make the decision. Ultimately, what they've asked for, candidly, is not to be put in the same position they would have been had we not breached the contract. What they really want to be is put in the same position they would have been had they not entered into the contract in the first instance. They had an agreement of $3 million a year that was deteriorating, to be sure, nationwide. They sought a better opportunity. They reached out. They analyzed us. We entered into this agreement. We clearly did it in good faith. Notwithstanding a lot of claims about how this went south early, the reality is Great West put $2.5 million in the Conference of Mayors' pockets as demonstrating its good faith desire to be able to transfer all of the endorsements from the existing nationwide accounts over to our accounts. So if we put aside the advance for a second, the $2.5 million advance, what should happen in a case like this? Why would the mayors enter into an agreement with Great West where if Great West does nothing, then the recovery is nothing? Well, in part because... First of all, is that premise right? If you don't have... We both saw it. I mean, it was reciprocal, right? Yeah. 2.1, 6.2 impose exactly the same restrictions on it. And the reason why you would do this is because of the fear of completely speculative and unknowable injuries that might arise if one party or the other is deemed or viewed as having not done its part. And it's not as though you're left without a remedy under these circumstances. All you're left with is... What you are left with is the reliance damages. I mean, you usually have expectation damages or reliance damages. And what would those be in a case like this? In a case like this, it would have been all of the actual expenditures made by the Conference of Mayors in reliance on the agreement and in reliance on our performance of the agreement. And so, the trips they made, the calls they made, the employees whose resources were devoted. And I don't think that's true from day one. I think it would have to be a more nuanced analysis than that. I think what you'd have to do is look at what point in the process. Clearly Great West made a determination that its sales efforts were not going to succeed. And to be sure, eventually said the better course here would be to cut our losses. That didn't happen immediately. And indeed, obviously, as you say, you can put aside the $2.5 million advance. But the truth is we lost the vast majority of the $2.5 million advance. So it wasn't as though this was in any meaningful sense cost free. But the reason why you would enter into this agreement, and it's not uncommon to have limitations on liability because we're talking about a purely speculative venture that had no comparator in the market. So to go back to the contract argument, it seems to me that the two sides Well, it has a comparator, which is the previous contract. You just think it's flawed. Well, I think, yeah, I think it's hopelessly flawed. And you would at least require some sort of expertise. You couldn't just say, well, here's an arrangement that's a flat fee, $3 million. You've been in the business for 30 years. You've been endorsed by the various relationships established. And now you're going to come in. I mean, I do think both parties hoped, at least, that what would happen is that the U.S. Conference of Mayors endorsement would suddenly cause the mayors to say, oh, okay, well, let's just go over with the Great West plan. But that's not how it worked out. It was a much more competitive environment than that. So the market we're looking at after the agreement is entered into bears no relationship, Judge Ginsburg, to the market that existed prior to that point in time. And indeed, the market prior to that point in time was deteriorating, as Nationwide was saying, look, we're paying way too much. Did you say anything or put in anything about a change in the market? Oh, sure. We have a whole lot of evidence about why we tried, you know, that there was a letter from the U.S. Conference of Mayors specifically saying you don't have to do anything. I understand that. But you wanted them to produce, essentially, some statistical evidence, right, about market conditions, or to show that... They could have put that in. And I'm asking whether you put anything comparable in. Only in the sense of, obviously, how our sales actually performed. I mean, we put in the evidence. Any other changes in the, nothing statistical or what have you, about the marketplace? No, we did not put in specifically any evidence along those lines that I recall. But, and I don't think that the plaintiffs, you know, were limited only to putting in that kind of proof. I mean, there are, there's a whole list in 913, 914 of the Joint Appendix of target municipalities that Great West developed going into this contract. All of those are case, could have simply gone to those individuals and said, so why didn't you shift over? And was it a failure on the part of Great West, or was it some other explanation for it? And presumably if it had, in fact, been a consequence of our failure, they would have had tons of evidence. And then from that, you take that plus an expert, then you can get to the point of lost profits. You can't just jump to lost profits by saying there's been a breach of the agreement without knowing what would have happened in a but-for world. Did success in this contract depend upon converting municipalities, or simply recruiting new ones? I don't think you could meaningfully succeed without recruiting new ones. Recruiting new ones. New ones. I mean, no, without, I'm sorry, without converting. And to get to any of the sort of, you know, more extravagant numbers, you would almost certainly have to have recruited new ones as well. But I think, you know, if you look at a lot of the assessment going in, it was kind of this, there was a $3 million bogey, that basically if you took the 300,000 participants that Nationwide had, and you converted them over, you would end up with about, you know, you would have, to this system, it would be about $3 million. So, you know, I think the parties were, at least at some point, working on that assumption. And what turned out is that that just didn't work that way. Can I ask about the contract argument? So, the contract language starts out by saying Great West agrees to defend, indemnify, and hold harmless, and then it has a bunch of other stuff that follows. When you just read that, it sounds like a classic third party indemnification rubric. Right. And that's part of it. But if you read the last sentence, and 6.3, the last sentence, notwithstanding any provision in this agreement, Great West will not be liable for any loss of revenues or profits. That's much more sweeping. And it says, don't worry about what's in the language before this point. There's no lost profits and no lost revenues. And if you combine that with 6.3, it says the party's exclusive remedy comes out of the indemnification provision of 6.1 and 6.2. What about 7.1, 7.2, and 7.3? Those are procedures. They say what happens if you have a dispute, and how do you resolve the dispute? In the first instance, you negotiate. In the second instance, you mediate. And in the third instance, you litigate. They don't say anything about the substance of what you're allowed to take into account. It only tells you the process by which you need to exercise it and where you can bring that particular litigation. Section 7 simply can't. It would be a huge leap to suggest that Section 7 meaningfully limits the expansive languages of Section 6.2 and 6.3. What's the attorney's fee shifting provision in 7.3 then? Well, 7.3, I think it's best read as understanding that 7.2 says in mediation, you pay your own costs. And in 7.3, it says in litigation, the prevailing party wins. It's designed to deal with the relationship between 2 and 3. It doesn't speak back to 6. But doesn't that conflict with the indemnification provision? It doesn't conflict. I mean, it's a little redundant, I suppose, is the best way to think of it. But as Judge Srinivasan said, I mean, that first language is just a broad kind of boilerplate indemnification language that's out there in general, which if that's all we had here, I wouldn't be standing, well, I might be standing here, but I have a whole lot harder time standing here under those circumstances. But if you read it, if you get past the indemnification language, and both this Court and the D.C. Court of Appeals have held that indemnification-type language can be applied to first-party claims and look at the last sentence and look at Part B that talks simply about breach, and to be candid, because you're just talking about the use of broad language at the beginning on the whole harmless, and then it gets down to the specifics, I wouldn't say this was a perfectly drafted in order to make every single provision, but it nevertheless reads, to me at least, much more naturally as saying, look, you don't get lost profits and you don't get lost revenue, but you do get all the reliance damages that you're in line with. So let's suppose the outcome of the trial had been that the jury found that your client breached the contract but awarded $1 in damages. Would the mayors be entitled to attorney's fees under the fee-shifting provision? Yeah, they would be a prevailing party within the meaning of the agreement. Now, there would be a question as to how you get to the even nominal damages in those circumstances where you haven't proven any basis for any lost profits. Again, it was their choice. They made a tactical decision. They could have done both. They could have said, look, we're going to show you what our reliance damages are and we're going to show you what our lost profits are and we're going to ask you to decide both of those. And we'll see how it plays out at the end. You don't take issue with the proposition that all of 6.2 is an indemnification provision? In other words, it's all indemnification. It's just that you say even though it's indemnification, part of it applies to third-party arrangements and part of it only applies to first parties. I don't think there's any magic to the use of the word indemnification. It obviously has a tendency to be connoted in terms of third parties. Typically, one would think of third parties. The courts have recognized that indemnification, that language, but the use of indemnification language can nevertheless, in context, be reasonably applied to first-party cases. New York case to that effect, but D.C. cases tend to point in the other direction. Well, I think the best case for us is Dan's Construction Corporation, which does say that indemnification, if it's clear enough on the face of the agreement, indemnification provisions can, in fact, apply to first-party claims. It can. In that context, they get attorneys fees. I'm sorry? Did you say Vance? No, Dan's. I'm sorry. D-A-N apostrophe S. Construction Corporation. Yeah, I suppose it can in that it's not literally impossible for indemnification to be referring to first party, but it's not the first thing you think about. To be sure, but that's why I think it's important to recognize that the language, it's a completely separate sentence. I don't think, notwithstanding any provision, I don't think that's boilerplate language in an indemnification agreement. It seems to me clearly intended to say to the parties, look, this is going to be a speculative deal, and so we're not going to have lost profits, we're not going to have lost revenues as part of the equation, and the only source of a remedy, and the next provision is what, to my mind, seals it and just says, which has clearly got to be involved with a first-party claim. The only, the sole and exclusive remedy that the parties have under these circumstances is 6.1 and 6.2. It is, but the notwithstanding clause, even under your argument, is still an indemnification provision. Yes, but understood as applying to both third-party and first-party claims. Right, absolutely. Again, aside from the fact that headings don't count, I think if you didn't have, I mean, if you had, if you took out the heading and you just read this, you say, okay, this is going to start off as an indemnification, you just keep reading and say, oh, well, but this is now shifted from what I think of as a third-party provision. I mean, you know, if this had said, if it had started off in claims against third parties. But the heading, I didn't understand, this is, I'm trying to get to this, I didn't understand the headings argument, because I didn't understand why the heading, you would say that you should discount the heading. Well, because the contract says the headings are not meant to. No, right, I get, I know that there's a provision that says that. Sorry, it wasn't precise enough. I know that there's a provision that says that, but 6.3 itself says that each party acknowledges and agrees that sole and exclusive remedy with respect to any and all claims. Shall we pursue it to the indemnification provisions of 6.1 and 6.2? So it's already talking, 6.3 is labeling those indemnification provisions. So it doesn't matter that. No, I agree with that. I mean, our pushback there, candidly, is designed largely to debunk the sort of purely intuitive reaction people have to the term indemnification that it invariably refers to third parties. Right, but you're still stuck with that intuitive reaction because 6.3 speaks in terms of indemnification provisions. Right, but it's talking about 6.1 and 6.2 as the sole remedy and the idea that the sole remedy between the parties is provided for. It's just, it's there. It's just using it as a shorthand to say 6.1 and 6.2. I don't see, again, given that indemnification doesn't preclude first party claims being included within the analysis, I don't see how you get out of the explicit language in this particular case. Counsel? Yes, sir. I don't see the case you mentioned in your blue brief. In the great brief, there is something called James G. Davis construction. Right, and it cites the, I'm sorry, I apologize. That's the one you meant. Yes, Your Honor. Thank you. Any other questions? May it please the Court, Margaret Warner for Applebees. I have three points on Great West's limitation of liability defense. One, this is an affirmative defense that must be pled as such. Great West never pled it. The Harris decision holds that 8C means what it says. Great West waived. Number two. But you never, you never pointed that out, so. We did not, Your Honor, however, we did not have occasion to because of the fact that the argument was raised initially in a motion of limine. It was never raised by Great West in a motion for summary judgment. The Court ruled as a matter of law. The Court said when they made a 50A motion that he would not revisit it. He made that clear. The jury found that Great West breached its duty of good faith and fair dealing. When you look at the full instruction Judge Hogan gave and the trial record, the jury necessarily found that Great West acted in bad faith. It is Hornbook law, straight out of Corbin on Contracts, that a party that acts in bad faith cannot take advantage of a limitation on damages. This is the majority rule. This Court does not need to reinterpret the agreements. But if it goes on to do so, my third point. These provisions are indemnification provisions. You do not need the indemnification title to know that. The language of the first sentence of 6.2 says, Great West agrees to defend, indemnify, and hold harmless. That's traditional indemnification language, as Judge Sreenivasan said. Hensel felt, therefore, controls. So can I ask you a question about that? Let's put aside your first two arguments, just for my purposes at least. I know you have them, but let's just stipulate to put those aside for a second. So on the language of the contract itself, do you think that it's impossible to understand the language, the term indemnification, by reference to a first party situation? No. This contract, this arrangement, makes complete sense, and for the following reasons. Number one, 6.1 and 6.2 both have that predatory clause that is traditional indemnification language. That applies to both subsection A and subsection B in the agreement. Secondly, the language of 6.1 is very clear. It states that, in no event shall USME's liability exceed the amount of fees. That's a stop-loss provision. In addition, it further says, notwithstanding the foregoing, USME shall be liable for its own actions performed in its capacity as a registered municipal advisor. These provisions are key in the context of this entire provision, as Hensel Phelps says you must read it, because there are attachments to these agreements. Attachment A1 was the separate agreement between the cities and the mayors with regard to services provided by the mayors. Great West specifically said it would not take on third party indemnification liability for those activities. There was a parallel provision, attachment A3 at JA 785 and A4 at JA 799 were the two agreements through which this entire arrangement made sense. The agreement by which Great West would be the record keeper for plans throughout the United States for these city employees and A4, the agreement by which a Great West subsidiary would provide advisory services. In that context, the indemnification provisions and the stop loss provision in 6.1 and the requirement that Great West would not take on liability of the mayors as registered municipal advisors makes complete sense. All of section 6 relates to potential third party liability. Let me ask you this, what about 6.3? 6.3, your honor? This is the sole and exclusive remedy with respect to any and all claims relating to the subject matter of this agreement. That's correct. Agreement means the contract, the whole contract. The subject, it says any and all claims, and this is very important, the language of 6.3 is very different than the language contained in section 7, which demonstrates further that it only applies in the context of indemnification liability. It says 6.3, any and all claims relating to the subject matter of the agreement. The subject matter of the agreement included the attachments, included the indemnification, as Judge Srinivasan said, included indemnification provisions of 6.1 and 6.2, which swept in the stop loss with regard to the mayor's liability Is the breach of contract claim related to the subject matter of the agreement? I think the better reading, your honor, is that under 7.1 the parties clearly provided for any dispute between them relating, arising out of or relating to this agreement or the breach hereof. Section 7 clearly related to breach as between the parties. Section 6 related to third party indemnification liability as provided for and as caverned, if you will, by the parties to the contract. So I guess just semantically, so 6, it seems to me your argument is, and I think there's force to this, that it deals with indemnification. Correct. And 6.3 says indemnification provisions. So the question then becomes, is indemnification the same thing as third party indemnification? Because I think, of course, if it's third party indemnification you're home free. Then the case is over. The question is, does a context that deals specifically with indemnification mean third party indemnification to the exclusion of first party arrangements? Hensel Phelps says, in the context of the agreement, there must be clear and unequivocal language to sweep in a first party claim to an indemnification agreement. Right. So you can rely on the kind of canon of construction that emerges from Hensel Phelps and say, when you're in doubt, your side wins. Absolutely. Absolutely. That is the law as this circuit has stated under D.C. law. So then the question becomes, is there something in the agreement that would tip the presumption back against you? Or at least get back to equipoise so we look at it. Here's my question on that. So 6.2a speaks in terms of notice and a duty to defend, which that's clearly third party related. That's classic third party related. And 6.2b doesn't have that, the notice and duty to defend. So the argument that the other side makes is, well look, then that just shows that 6.2a is third party, but 6.2b is first party. And what's your response to that? Judge Srinivasan, that answer by Great West writes out of the agreement the first sentence of Section 6.2 and 6.1, which clearly agrees, Great West agrees to defend, indemnify, and hold harmless. Classic, traditional indemnification language before the colon, which applies to b. You keep saying indemnification language, and it is classic indemnification language. The question is, does that mean only third party as opposed to first party? Because I think the term indemnification, it's not incompatible with the first party claim, the term indemnification, as far as I understand it. You can correct me if that's wrong. But is it clear and unequivocal under Hounsell-Phelps? We say no. Yeah, so you can come back to clear and unequivocal. I understand that. And that argument is not without force. But in terms of 6.2b, because I think the argument that Great West is making is, 6.2b says defend, indemnify, and hold harmless. Defend, sure, that's third party. That doesn't make any sense in the context of a first party claim. But indemnify, it's not incompatible with first party. And what 6.2b is, that's the first party part of this, because if it was also a third party part, then it would have a notice and duty to defend component associated with it. Respectfully disagree, Your Honor, because 6.2b says, as a result of any breach of or any inaccuracy in any of the representations, warranties, covenants, and agreements of Great West contained in this agreement. Contained in this agreement included the attachments A3 and A4 in which Great West undertook with the plans around the country to provide record keeping services and advisory services. And it was that third party liability arising from these contractual agreements that is what B goes to. Absolutely. You cannot, you must read this in the context of the entire arrangement, as Hensel Phelps says. And why would there not be, maybe there's an easy answer to this, why would there not be a notice and duty to defend associated with B? Does that just not work in the context of the breaches that are covered by B as opposed to the kind of tortious conduct that's covered by A? Yes, and furthermore... Yes, meaning that... Yes, meaning that I believe that the prefatory language here, agrees to defend, indemnify, and hold harmless, would bring this in and there would be no need for that additional language. It may not be the most artful language ever drafted, but it is not a clear and unequivocal statement that this clause titled indemnification, which is part of the context, applies specifically to first party between the parties, when then there's the next provision of seven, which clearly applies to disputes arising out of or related to these agreements. Clear first party language. And finally, their argument says there's no remedy. No remedy for breach. That is an argument that proves too much. I guess the remedy would be the opposing side says you're out-of-pocket expenses in reliance on the agreement. Unfortunately, the record is absolutely clear that the mayors had no out-of-pocket expenses because under the terms of the agreement, Great West reimbursed them for those out-of-pocket expenses. So their argument says that we entered into a 10-year contract where the only thing we could get at the end of the day, not the fruits of the agreement, the fees and royalties, which were clearly the fruits of the agreement, the only thing we could get is a dollar for a breach. They could breach with impunity one dollar for a 10-year contract. It just proves too much. It shows that Hensel Phelps is the correct guiding principle here that agreements must state clearly and unequivocally that an indemnification provision applies to the first party situation. Okay, thank you, Counsel. The judgment should be affirmed. Thank you. Thank you. Mr. Phelps will give you your two minutes of rebuttal. Thank you, Justice Srinivasan. I'll try to be brief, maybe under two minutes. First of all, I think it's not insignificant that my friend starts off with two arguments that she has never presented before in this litigation as the lead reason for why you shouldn't hold the lost profits of BART under these circumstances. I think it reflects the lack of confidence in the arguments that derive from the contract and from the evidence in this case. Second of all, I take her argument to have conceded that indemnification can include first party agreements if the language is clear enough from the circumstances provided for that. I have no doubt that there was a provision, there was an agreement between the parties as to trying to indemnify each other from a whole host of activities that would arise out of this contract. That's precisely what the first part of 6A is designed to deal with. 6.1A and 6.2A are designed to deal with that particular problem. But as Judge Riavasa and as you say, the problem with trying to read 6.2B as only involving third party claims is why is it that we would suddenly take out all the language about the notice about a defense and being able to take over the claims. Obviously, the same protections would have arisen in that context unless the parties understood what they're really talking about there under those circumstances are the first party claims. And again, Judge Wilkins, you quoted the language of the exclusive remedy. I mean, the language on its face could not be any clearer in terms of saying exactly what the outcome is. And as far as the remedy, it may turn out in this context because we, in fact, will front of them a ton of money and because we paid their expenses as it went along that they are, in fact, not out of pocket. But the reality is is the question is in contract law in general, is it crazy to say you're going to give up lost profits when there's an entire branch of damages that says you're entitled to reliance damages? The judgment below should be reversed. Your honors. And no questions. Thank you, counsel. Thank you, counsel.
judges: Srinivasan, Wilkins, Ginsburg